Certiorari Dismissed, September 14, 2011, No. 33,104

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2011-NMCA-094

Filing Date: May 31, 2011

Docket No. 29,707

ISABEL BARRON, as power
of attorney for MANUELA BARRON,

    Plaintiff-Appellee,

v.

THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY, a North
Dakota corporation, d/b/a BETTY DARE
GOOD SAMARITAN; MYRNA ACOSTA,
a New Mexico resident, director of nursing,
and DOES 1-10,

    Defendants-Appellants.

APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
Sheri Raphaelson, District Judge

Harvey Law Firm, LLC
Dusti D. Harvey
Jennifer J. Foote
Albuquerque, NM

Duhigg, Cronin, Spring and Berlin, P.A.
Nancy Cronin
Albuquerque, NM

for Appellee

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Martha G. Brown
Deana M. Bennett
Albuquerque, NM

1

for Appellants

<strong>OPINION</strong>

**SUTIN, Judge.**

**{1}** Defendants The Evangelical Lutheran Good Samaritan Society d/b/a Betty Dare Good Samaritan and Myrna Acosta (collectively Defendants) appeal the district court's denial of their motion to dismiss and compel arbitration pursuant to an admission agreement. We consider whether Betty Dare resident, Manuela Barron, gave sufficient authorization to her granddaughter, Cindy Chapman, to agree to binding arbitration when Ms. Barron authorized Ms. Chapman to complete her admission paperwork. We conclude that under the circumstances of this case, the authority granted to Ms. Chapman by Ms. Barron was sufficient to allow Ms. Chapman to agree to arbitrate disputes, and we reverse the district court's denial of Defendants' motion to dismiss. In reaching this conclusion, we consider New Mexico's public policy of enforcing arbitration agreements.

**{2}** Additionally, we reject Plaintiff Isabel Barron's contention that we should affirm the district court's decision on the alternative grounds that (1) the circumstances surrounding the arbitration provision rendered it procedurally unconscionable, or (2) the arbitration provision was not supported by consideration. We remand to the district court for a determination as to whether the unavailability of the National Arbitration Forum (NAF) renders the arbitration clause unenforceable.

**BACKGROUND**

**{3}** Ms. Barron was discharged from Gerald Champion Medical Center to Betty Dare on April 10, 2006. She was admitted to Betty Dare in order to recuperate from hip surgery and upon advice from hospital staff. Lucila Santillan was the social services director and handled admissions and discharges, among other things. After Ms. Barron had spent her first night in the facility, Ms. Santillan asked Ms. Barron "who would be doing her paperwork, trying to find out if she was going to be able to do the paperwork herself." When Ms. Barron was admitted to Betty Dare, she was mentally competent, alert, and oriented. According to Ms. Santillan, Ms. Barron responded that Ms. Chapman would be doing her paperwork. On April 11, 2006, Ms. Chapman met with Ms. Santillan, at which time, Ms. Santillan reviewed "every section of the Admission Agreement" with Ms. Chapman. At this meeting, Ms. Chapman filled out all of the paperwork related to Ms. Barron's admission to Betty Dare. The admission paperwork included a thirteen-page Admission Agreement, as well as nine other documents.

**{4}** Also at this meeting, Ms. Chapman told Ms. Santillan that she (Ms. Chapman) was assuming responsibility for Ms. Barron's care, that she would have Ms. Barron's power of attorney, and that she would be the responsible party for Ms. Barron during her stay at Betty

2

Dare. Pursuant to these representations by Ms. Chapman, Ms. Santillan marked three boxes on the final page of the Admission Agreement: Medical or Health Care Power of Attorney, Other (next to which Ms. Santillan wrote "granddaughter"), and Financial Power of Attorney. Ms. Santillan marked these boxes in Ms. Chapman's presence. Ms. Chapman signed her own name on the final page. The day after Ms. Chapman completed the admission paperwork, Ms. Barron signed a power of attorney for healthcare that designated Ms. Chapman as her agent to make healthcare decisions. The power of attorney for healthcare was subsequently presented to Ms. Santillan.

{5}	Page twelve of the Admission Agreement was a full-page form titled "Resolution of Legal Disputes." The form included designated lines for the resident's name and the date, followed by three paragraphs. The first paragraph addressed the resident's rights. The second paragraph contained explanations of the types of disputes that would be "settled exclusively by binding arbitration[.]" The third paragraph explained what "agreeing to arbitrate legal disputes means[.]" The first two sentences of the third paragraph read, "[t]he [r]esident understands that agreeing to arbitrate legal disputes means that [she] is waiving [her] right to sue in a court of law and to a trial by jury. If the [r]esident does not wish to agree to arbitration, then [she] should inform the [f]acility by marking the box below and initialing and dating where indicated."

{6}	Ms. Barron's name and the date were handwritten at the top of the Resolution of Legal Disputes form in the designated lines. Directly below the resident's name in bold type was a sentence that read, "**Please note that the [r]esident's agreement to arbitrate disputes is not a condition of admission or of continued stay.**" At the bottom of the page there was a box, next to which read, "No I do NOT wish to arbitrate disputes[.]" The box was unmarked. Directly below this option to reject arbitration was a line, initialed by Ms. Chapman, acknowledging receipt of a copy of the Resolution of Legal Disputes form. The form provided the phone number, mailing address, and website address for the NAF to request information regarding rules and procedures.

{7}	In an affidavit provided in support of Defendants' motion to dismiss, Ms. Santillan stated that, when she met with Ms. Chapman, she "spent approximately an hour and a half reviewing the Admission Agreement with [Ms. Chapman, and that she] went over every section of the Admission Agreement with [her]." Ms. Santillan further stated that she "asked [Ms. Chapman] to read the Resolution of Legal Disputes section" and that "[o]nce she had read that section, [Ms. Santillan] . . . explained to [Ms. Chapman] that if she did not want to agree to arbitrate, she would have to mark an 'X' in the box indicating that she did not wish to arbitrate disputes and initial that place on the form."

{8}	The record reflects that Ms. Chapman read the Resolution of Legal Disputes form. In response to a question about her understanding of the Resolution of Legal Disputes form, Ms. Chapman stated in a deposition that she "read over it" though she could not "say really a hundred percent [that she] understood it[.]" Ms. Chapman also stated that when she took the papers home, following her meeting with Ms. Santillan, she "read them over." Despite any limited understanding of the Resolution of Legal Disputes form, Ms. Chapman stated

3

that she did not contact the NAF for more information. Nor did Ms. Chapman contact Ms. Santillan with any questions after she took the paperwork home and read over it.

**{9}** It is undisputed that Ms. Barron was not specifically apprised of the fact that the paperwork for her admission included an arbitration agreement. Ms. Santillan stated in a deposition that she did not recall everything she discussed with Ms. Barron; however, her typical practice was to ask a new resident "who is going to be signing your paperwork" and to tell the resident that "[t]here's Medicare paperwork that needs to be signed, so that Medicare can pay for your therapies." Ms. Chapman also stated in her deposition that she did not discuss the arbitration-related form with Ms. Barron.

**{10}** Ms. Barron's term of residence at Betty Dare continued from April 10, 2006, until August 8, 2006. During her stay at Betty Dare, Ms. Barron allegedly suffered injuries that required hospitalization and caused her overall health to deteriorate. In October 2006, Ms. Barron transferred healthcare power of attorney to Plaintiff, Ms. Barron's daughter. In August 2007, Ms. Barron granted general power of attorney to Plaintiff. In March 2008, Plaintiff, acting pursuant to Ms. Barron's power of attorney, filed a complaint in district court against Defendants alleging, among other things, negligence and violation of the Unfair Practices Act, NMSA 1978 §§ 57-12-1 to -26 (1967, as amended through 2009). Subsequently, Defendants filed a motion to dismiss and compel arbitration based on the arbitration clause in the Admission Agreement.

**{11}** At a hearing, the district court provided three reasons for denying the motion to dismiss and compel arbitration. The district court stated that "[t]he agreement by Ms. Barron that Ms. Chapman would be basically doing all of the paperwork for her for admission [was] not detailed enough to allow [the court] to conclude that Ms. Barron was giving Ms. Chapman the right to determine a legal forum for disputes." The court reasoned that "what [it could] tell from the record [was] that there was no detailed list, for instance, presented to Ms. Barron saying, [']Do you agree that Ms. Chapman can decide all of these enumerated things for you?['] And [this] included [choosing the] forum for settling legal disputes." The court further concluded that any agreement about arbitration would fall outside the scope of the Uniform Health-Care Decisions Act (the Act). *See* NMSA 1978, §§ 24-7A-1 to -18 (1995, as amended through 2009). And finally, the court found that "[t]he only way Ms. Chapman could have had authority to enter into the arbitration agreement would have been through a power of attorney such as the one that ultimately was signed by Ms. Barron's daughter." Defendants appeal from the district court's denial of their motion to dismiss and compel arbitration.

**DISCUSSION**

**{12}** On appeal, Defendants argue that (1) Ms. Chapman was expressly authorized by Ms. Barron to act on her behalf and, as Ms. Barron's agent, Ms. Chapman did not need a separate grant of authority to bind Ms. Barron to arbitration; (2) the district court's reliance on the Act was erroneous (a) because Defendants did not contend that Ms. Chapman's authority arose from the Act, and (b) because the court's interpretation of the Act was improper; and (3) the district court erred when it severed the arbitration clause from the Admission

4

Agreement. We examine New Mexico's public policy on arbitration agreements, followed by a discussion of agency law. We conclude that the scope of Ms. Chapman's agency was not limited so as to prohibit her from agreeing, on Ms. Barron's behalf, to arbitrate disputes. We disagree with the district court that Ms. Chapman could only act on Ms. Barron's behalf pursuant to an enumerated list or a power of attorney. We do not address the Act because Defendants did not argue in the district court, nor do they argue on appeal, that Ms. Chapman's authority stemmed from that Act. In light of the fact that we are reversing the district court's denial of Defendants' motion to dismiss, we need not address Defendants' argument regarding the district court's severance of the arbitration provision from the Admission Agreement. We further reject Plaintiff's arguments for affirmance to the effect that the arbitration provision was unconscionable or lacking consideration. Finally, we remand to the district court the issue of the NAF's unavailability and the question of what effect that has on the overall contract.

**STANDARD OF REVIEW**

**{13}** The issues presented in this appeal are subject to de novo review. *See Piano v. Premier Distrib. Co.*, 2005-NMCA-018, ¶ 4, 137 N.M. 57, 107 P.3d 11 (reviewing de novo a district court's denial of a motion to compel arbitration and, "[s]imilarly, whether the parties . . . agreed to arbitrate presents a question of law, and we review the applicability and construction of a contractual provision requiring arbitration de novo"); *Robertson v. Carmel Builders Real Estate*, 2004-NMCA-056, ¶ 18, 135 N.M. 641, 92 P.3d 653 (providing a definition of "agent" and explaining that, where the material facts are undisputed, the existence of an agency relationship becomes a conclusion of law, requiring de novo review).

**Arbitration**

**{14}** The New Mexico Supreme Court "has repeatedly reaffirmed the strong public policy in this [S]tate . . . in favor of resolution of disputes through arbitration." *Fernandez v. Farmers Ins. Co. of Ariz.*, 115 N.M. 622, 625, 857 P.2d 22, 25 (1993). "When a party agrees to a non-judicial forum for dispute resolution, the party should be held to that agreement." *Lisanti v. Alamo Title Ins. of Tex.*, 2002-NMSC-032, ¶ 17, 132 N.M. 750, 55 P.3d 962. "[R]educ[ing] caseloads in the courts, not only by allowing arbitration, but also by requiring controversies to be resolved by arbitration where contracts or other documents so provide" was the legislative intent behind this State's enactment of the Uniform Arbitration Act. *Dairyland Ins. Co. v. Rose*, 92 N.M. 527, 531, 591 P.2d 281, 285 (1979); *see* NMSA 1978, §§ 44-7A-1 to -32 (2001).

**{15}** Inasmuch as arbitration provisions are favored where they have been agreed upon by both parties, New Mexico courts have clearly distinguished those situations where lack of agreement by the parties renders an arbitration clause unenforceable. *See Lisanti*, 2002-NMSC-032, ¶¶ 4-8 (holding an insured's right to a jury trial was violated by a state regulation that mandated arbitration of certain title insurance disputes at the option of one party); *see also McMillan v. Allstate Indem. Co.*, 2004-NMSC-002, ¶¶ 1, 20, 135 N.M. 17, 84 P.3d 65 (holding that in the context of uninsured motorist disputes where the insurance endorsement provides for arbitration only upon the agreement of both parties, the insureds

could not unilaterally compel insurer to arbitrate); *DeArmond v. Halliburton Energy Servs., Inc.*, 2003-NMCA-148, ¶¶ 5, 14, 23, 134 N.M. 630, 81 P.3d 573 (holding that an employee could not be bound to an arbitration agreement that had been mailed to him by his employer, acceptance of which was indicated by employee's continued tenure with the company, where there was no evidence in the record that the employee had received, read, or understood the document). Thus, New Mexico courts generally uphold arbitration agreements except in the absence of a clear agreement on behalf of both parties to arbitrate disputes.

**Agency**

{16}    "An agent is a person who, by agreement with another called the principal, represents the principal in dealings with third persons or transacts some other business, manages some affair[,] or does some service for the principal, with or without compensation." *Tercero v. Roman Catholic Diocese*, 2002-NMSC-018, ¶ 12, 132 N.M. 312, 48 P.3d 50 (internal quotation marks and citation otmited). "The law in New Mexico is that an agency relationship can be created orally[.]" *DeBaca, Inc. v. Montoya*, 91 N.M. 419, 420, 575 P.2d 603, 604 (1978). "The authority of an agent may be actual or apparent." *Tercero*, 2002-NMSC-018, ¶ 12. "Actual authority is given to the agent by the principal in terms that are express, or in terms that are implied from words or conduct of the principal to the agent or from the circumstances of the relationship." *Comstock v. Mitchell*, 110 N.M. 131, 134, 793 P.2d 261, 264 (1990) (Ransom, J., specially concurring). "Apparent authority arises from manifestations by the principal to the third party and can be created by appointing a person to a position that carries with it generally recognized duties." *Diversified Dev. & Inv., Inc. v. Heil*, 119 N.M. 290, 296, 889 P.2d 1212, 1218 (1995) (internal quotation marks and citation omitted). A principal is bound by the acts of his or her agent within the agent's actual designated authority and is also bound by the acts of the agent that the principal "holds the agent out to the public as possessing." *Fryar v. Emp'rs Ins. of Wausau*, 94 N.M. 77, 80, 607 P.2d 615, 618 (1980) (internal quotation marks and citation omitted). Furthermore, "a principal . . . is responsible for the acts of the agent when the principal has clothed the agent with the appearance of authority." *Romero v. Mervyn's*, 109 N.M. 249, 253, 784 P.2d 992, 996 (1989). In considering the scope of an agent's apparent authority, New Mexico courts look to the reasonableness of the third party's reliance on the agent's representation of authority. *See Comstock*, 110 N.M. at 132, 793 P.2d at 262 (stating that "a person dealing with an agent must use reasonable diligence and prudence to ascertain whether the agent is acting within the scope of his powers"). Where a principal claims not to be bound by an agreement with a third party because it was made by an agent who exceeded his or her authority, the proper inquiry is whether the third party "knew or through the exercise of due diligence should have known that [the agent's] authority was limited" to the extent that the principal claims. *Id.* at 133, 793 P.2d at 263. A principal is bound by his or her agent's actions "when the principal has clothed the agent with the appearance of authority" and that authority "carries with it generally recognized duties." *Heil*, 119 N.M. at 296, 889 P.2d at 1218 (internal quotation marks and citations omitted).

{17}    Ms. Chapman had actual authority. The evidence indicates that she was given authority either expressly or in terms that were implied from words or conduct of Ms. Barron. *See Comstock*, 110 N.M. at 134, 793 P.2d at 264 (Ransom, J., specially concurring)

(citing Restatement (Second) of Agency § 7 cmt. c (1958) for the proposition that "[a]ctual authority is given to the agent by the principal in terms that are express, or in terms that are implied from words or conduct of the principal to the agent or from the circumstances of the relationship"). Ms. Chapman also had apparent authority given that Ms. Barron communicated Ms. Chapman's authority to Ms. Santillan. *See Comstock*, 110 N.M. at 134, 793 P.2d at 264 (citing Restatement (Second) of Agency § 8 cmt. e & § 27 cmt. a (1958) to support "apparent authority must emanate from the conduct of the person to be charged as principal").

**{18}** Plaintiff agrees that Ms. Barron authorized Ms. Chapman "to complete her paperwork" for admission to Betty Dare. Plaintiff does not dispute that the arbitration clause was part of the Admission Agreement. Plaintiff expresses her perception of the arbitration clause as part of the overall Admission Agreement by stating that Ms. Chapman "signed the 'Admission Agreement,' which included an optional arbitration clause" and that "she signed the 'Admission Agreement[,]' which included an arbitration clause[.]"

**{19}** The parties' dispute centers on whether Ms. Chapman's authority was limited so as to exclude the arbitration clause from the paperwork. Plaintiff contends that Ms. Chapman's authority to complete the admission documents did not encompass the arbitration clause based on the following argument. Defendants' arbitration clause is titled "Resolution of Legal Disputes" and the title is closely followed by the statement, "Please note that the [r]esident's agreement to arbitrate disputes is not a condition of admission or of continued stay." Thus, according to Plaintiff, it cannot correctly be characterized as an admission document, as it was explicitly not required for Ms. Barron's admission to or continued stay at the facility.

**{20}** We are not persuaded. While the Resolution of Legal Disputes form does not require a prospective resident to agree to arbitrate future disputes, its placement in the Admission Agreement and its clear language indicate that, as a part of its standard admission procedure, Betty Dare requires an agreement as to how a resident and Betty Dare will resolve future legal disputes. Hence, the language contained in the form that "the [r]esident's agreement to arbitrate disputes is not a condition of admission" indicates that the facility will admit a resident who chooses not to arbitrate, just as it will admit a resident who does agree to arbitrate. The prospective resident's free choice as to arbitration must be made either by checking a box that specifically indicates the resident does not wish to arbitrate disputes or by leaving the box unchecked and acknowledging receipt of the form. Thus, we hold that the Resolution of Legal Disputes form is properly considered an admission document and that accepting or rejecting arbitration is part of the admission process.

**{21}** While conceding that Ms. Chapman had authority to complete the paperwork, Plaintiff appears to argue that it was a limited authority only to complete the paperwork related to Medicare. Plaintiff reasons that, in giving the authority, Ms. Barron could reasonably only have known that the paperwork included authorizations for Medicare payment. Plaintiff bases this argument on Ms. Santillan's deposition testimony that she typically singles out Medicare paperwork when she is describing the content of the paperwork to a new resident. Plaintiff also reasons that Ms. Santillan had only told Ms.

Barron that the paperwork was for Medicare and had not told her about the arbitration clause. Under these circumstances, Plaintiff argues, it was Ms. Santillan's responsibility to "use reasonable diligence and prudence" to ascertain whether Ms. Chapman was acting within the scope of her powers. *See Comstock*, 110 N.M. at 132, 793 P.2d at 262 (stating that "a person dealing with an agent must use reasonable diligence and prudence to ascertain whether the agent is acting within the scope of his powers"). Plaintiff concludes that because Ms. Santillan failed to exercise reasonable diligence, presumably by not asking Ms. Barron specifically whether Ms. Chapman had authority to agree to arbitration of future legal disputes, Ms. Barron cannot be bound by Ms. Santillan's "misplaced reliance" on Ms. Chapman's authority.

**{22}** We disagree with Plaintiff's view of the limitations of Ms. Chapman's authority. We find unavailing Plaintiff's argument that Ms. Barron could not have authorized Ms. Chapman to sign the arbitration clause because Ms. Barron was unaware of it. The parties agreed that Ms. Barron did, in fact, authorize Ms. Chapman "to complete her paperwork" for admission. Plaintiff's assertion that Ms. Barron's authorization was limited to the Medicare paperwork is not persuasive considering that the facility was prospectively assuming every aspect of her day-to-day care. Moreover, Plaintiff does not dispute Ms. Chapman's authority to complete any of the paperwork other than the arbitration clause. The following forms were also included in the admission paperwork, yet were separate from the Admission Agreement: (1) Handling of Resident Mail, (2) Resident Authorization of Benefits and Release of Information, (3) Statement to Permit Payment to Provider and Liability for Charges, (4) Patient Authorization Form (on which Ms. Chapman elected to reject a monitoring device for Ms. Barron's room), (5) Get a Lift Policy and Procedure (pertaining to mechanical lift devices), (6) Acknowledgment of Receipt of Notice of Privacy Practices, (7) Report to Social Security of Patient Admission From: Betty Dare Good Samaritan Center, (8) Social Security Split-Deposit Permission (permitting Betty Dare to accept Ms. Barron's social security check each month and apportioning that money partly to the resident trust account and partly toward payment of Ms. Barron's room charge), and (9) Resource Checks-Split Deposit Permission (similar to the preceding but pertaining to checks from alternative sources).

**{23}** Furthermore, Plaintiff does not present any evidence as to what Ms. Barron did or did not understand to be included in "the paperwork." The record does not reflect that Ms. Barron manifested any interest in what was or was not contained in "the paperwork." Ms. Santillan offered Ms. Barron the option of completing the paperwork herself, which she declined, and there is no evidence in the record that she requested any further information about the paperwork. Plaintiff, who visited Ms. Barron at the facility more than once, never asked to review the documents to see what had been agreed to as part of the admission process nor did she object to Ms. Chapman having signed the admission documents.

**{24}** Considering Ms. Barron's unlimited designation of authority to Ms. Chapman, Ms. Barron's apparent lack of interest in the content of the paperwork or in looking it over herself, Ms. Chapman's representation to Ms. Santillan that she would be assuming responsibility for Ms. Barron, and Ms. Barron's subsequent designation of Ms. Chapman as her agent under the power of attorney for healthcare, we are not persuaded that Ms. Barron's

broad grant of authority to Ms. Chapman to complete the admission paperwork should be viewed as narrowly as Plaintiff asserts. Nor do we believe that Ms. Santillan was remiss in her duty by not confirming with Ms. Barron that Ms. Chapman had authority to complete the arbitration clause contained in the Admission Agreement after Ms. Barron expressly held Ms. Chapman out as possessing authority to complete the necessary paperwork. *See Fryar*, 94 N.M. at 80, 607 P.2d at 618 (stating that a principal is "bound by his agent's acts within the apparent authority which the principal himself . . . holds the agent out to the public as possessing" (internal quotation marks and citation omitted)).

**{25}** Defendants argue that "established principles of agency law compel the conclusion that [Ms. Chapman] was authorized by [Ms. Barron] to enter into the Admission Agreement," and therefore her authority encompassed the selection of a dispute resolution mechanism as a necessary part of the admission process. Further, as Ms. Chapman's authority was unlimited, Ms. Barron was bound by Ms. Chapman's act of agreeing to the entire Admission Agreement, including the arbitration clause. Defendants' view is that Ms. Chapman was authorized to take all steps necessary to admit Ms. Barron to Betty Dare, and those steps included electing a dispute resolution forum.

**{26}** California courts have taken a similar view to that expressed by Defendants, and have concluded that

> [a]n agent or fiduciary has the authority to require a patient's medical malpractice claims to be arbitrated. The black letter statement of California law in this regard is, . . . an agent or other fiduciary who contracts for medical treatment on behalf of his beneficiary retains the authority to enter into an agreement providing for arbitration of claims for medical malpractice.

*Garrison v. Super. Ct.*, 33 Cal. Rptr. 3d 350, 358 (Ct. App. 2005) (internal quotation marks and citation omitted). Thus, under the law of California, agents with authority to admit their principals to medical facilities also had authority to sign arbitration agreements that were included in the admission paperwork as a related healthcare decision. *See Hogan v. Country Villa Health Servs.*, 55 Cal. Rptr. 3d 450, 453 (Ct. App. 2007) (holding that "unless that power is restricted by the principal[,]" an agent under a California statutory healthcare power of attorney "has the power to execute applicable admission forms, including arbitration agreements"). These cases support the view that an agent's authority to bind a principal to arbitration does not have to be specifically or separately granted. Rather, an agent with authority to complete the documents for admission is likewise permitted to decide on behalf of the principal whether future disputes with the facility should be arbitrated or litigated. *See Garrison*, 33 Cal. Rptr. 3d at 352, 358, 360-61 (holding that a healthcare power of attorney includes the authority to bind the principal to an optional arbitration agreement because, among other reasons, "[a]n agent has authority . . . [t]o do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency" and that "[t]he decision to enter into [such agreements] in connection with placement in a [healthcare] facility . . . is a proper and usual exercise of an agent's powers" (internal quotation marks and citation omitted)). As the *Garrison* court explained, "[w]hether to admit an aging parent to a particular care facility is a [healthcare] decision." *Id.* Therefore,

revocable arbitration agreements may be "executed as part of the [healthcare] decision[]making process." *Id.*

**{27}** Here, when Ms. Barron designated Ms. Chapman as her agent to complete the paperwork necessary for admission to Betty Dare, she did not limit Ms. Chapman's authority. When Ms. Barron executed a healthcare power of attorney in favor of Ms. Chapman one day after Ms. Chapman signed the admission paperwork, at the very least Ms. Barron was indicating her comfort not only with the authority just given to complete the admission paperwork, but also with Ms. Chapman making decisions for her specifically in regard to all aspects of healthcare, including end of life decisions. This is similar to *Carraway v. Beverly Enterprises Alabama, Inc.*, 978 So. 2d 27, 28-29 (Ala. 2007), in which a nursing home resident's brother acting as her "authorized representative" signed a number of admission documents on her behalf, including an arbitration agreement. Twenty-five days after her admission to the nursing home the resident executed a written power of attorney in favor of her brother. *Id.* at 28, 30. Later, the resident's brother sued the nursing home. *Id.* at 30. The nursing home filed a motion to dismiss and compel arbitration, which the trial court granted. *Id.* Relying on principles of agency law, the Alabama Supreme Court reasoned that "[j]ust as [her brother] signed all the other documents relating to [his sister's] admission into the nursing home on [her] behalf, [he] signed the arbitration agreement . . . expressly as an 'authorized representative.'" *Id.* Further, the *Carraway* court stated that "[t]here is no evidence indicating that [the resident] had any objection to [her brother's] acting on her behalf . . . . A few weeks into [the resident's stay] at the nursing home, she executed a [durable] power of attorney, giving [her brother] further authority to act on her behalf." *Id.* at 31.

**{28}** Here, as in *Carraway*, there was no evidence indicating that Ms. Barron objected to Ms. Chapman acting on her behalf. No limitation of any sort on Ms. Chapman's acknowledged authority was ever communicated to Ms. Santillan. Nor was there any indication that Plaintiff, who visited Ms. Barron at the nursing home a number of times, objected to Ms. Chapman having acted on Ms. Barron's behalf. To the contrary, Ms. Barron did not limit Ms. Chapman's authority to act on her behalf in completing the admission paperwork and nothing in the record indicates that either Ms. Barron or Plaintiff ever questioned Ms. Chapman or Ms. Santillan about what would be or had been agreed to as part of the admission process. Like the *Carraway*, *Garrison*, and *Hogan* courts, we view Ms. Barron's words and actions as indicating that Ms. Barron was comfortable with Ms. Chapman making admission decisions on her behalf without herself knowing or being specifically advised about the dispute resolution issue. As the Admission Agreement and the admission process included a decision on the Resolution of Legal Disputes form, we view Ms. Chapman's authority as encompassing that decision.

**{29}** Courts from other jurisdictions to which Plaintiff directs our attention have taken a more restrictive view. For example, some of the cases cited by Plaintiff stand for the proposition that authority under a healthcare power of attorney without further indication of authority is insufficient to allow the agent to bind the principal to arbitration. *See Life Care Ctrs. of Am. v. Smith*, 681 S.E.2d 182, 183-85 (Ga. Ct. App. 2009) (holding that the plain language of a healthcare power of attorney did not give daughter the right to sign away her

10

mother's right to a jury trial); *McNally v. Beverly Enters., Inc.*, 191 P.3d 363, No. 98,124, 2008 WL 4140635, at *1-2 (Kan. Ct. App. Sept. 5, 2008) (per curiam) (unpublished table decision) (holding that a healthcare power of attorney conferred by a resident to his wife explicitly limited the powers of the agent to those set out in writing in the document); *Tex. Cityview Care Ctr., L.P. v. Fryer*, 227 S.W.3d 345, 352-53 & n.7 (Tex. App. 2007) (determining that the medical power of attorney signed by the resident's daughter had not taken legal effect at the time the documents were signed and there was no evidence that the resident was even aware that her daughter had signed any documents on her behalf). We do not think these cases are persuasive.

**{30}** We reject Plaintiff's challenge to Ms. Chapman's authority because she had not received her healthcare power of attorney before she signed the admission documents. Ms. Chapman had actual and apparent authority, without the next-day healthcare power of attorney, to act as Ms. Barron's agent in signing the admission documents. It is this agency relationship upon which Defendants relied in the district court and rely here to prove that Ms. Chapman had authorization to act on Ms. Barron's behalf. As we have indicated, the healthcare power of attorney that Ms. Barron signed supports the already-given actual and apparent authority to complete the admission paperwork; however, the healthcare power of attorney was not the source of authority for Ms. Chapman's agency upon which Defendants relied in the district court or upon which they rely in this appeal. Thus, regardless of whether an agent's authority to admit a principal to a nursing home is granted through a healthcare power of attorney, as in *Garrison* and *Hogan*, or is orally granted, as in the present case, once granted, the authority encompasses arbitration agreement decisions.

**{31}** Plaintiff's other cases are unpersuasive because their facts or holdings make them inapplicable here. For example, *Lujan v. Life Care Centers of America*, 222 P.3d 970, 971-72 (Colo. App. 2009), involved an incapacitated patient whose doctor asked the family to appoint a healthcare proxy. The court held that "a [healthcare] proxy decision-maker . . . does not have authority to enter into arbitration agreements for incapacitated patients." *Id.* at 971. The court pointed out that a healthcare proxy is not selected by the patient, who has no role in determining what authority the healthcare proxy may have. *Id.* at 973. In the present case, Ms. Barron, unlike the incapacitated patient in *Lujan*, was alert and oriented, and chose Ms. Chapman to complete her admission paperwork. Thus, *Lujan* is inapplicable to this case.

**{32}** Also inapplicable and unpersuasive are *In re Estate of McKibbin*, 977 So. 2d 612 (Fla. Dist. Ct. App. 2008) (per curiam), *Ashburn Health Care Center, Inc. v. Poole*, 648 S.E.2d 430 (Ga. Ct. App. 2007), and *Mt. Holly Nursing Center v. Crowdus*, 281 S.W.3d 809 (Ky. Ct. App. 2008), upon which Plaintiff relies. In *McKibbin*, a Florida trial court held the decedent's estate was not bound by an arbitration agreement signed by the decedent's son upon her admission to a nursing home. 977 So. 2d at 613. There, the decedent's son had signed an arbitration agreement acting under a durable power of attorney which, under Florida law, is strictly construed to grant only the powers specified. *Id.* As nothing in the power of attorney stated that the decedent's son could sign an arbitration agreement on her behalf and "there was no other basis upon which to bind [the decedent] to the arbitration agreement[,]" the court reversed the trial court's grant of a motion to compel arbitration. *Id.*

11

As we have already explained, unlike the decedent's son in *McKibbin*, Ms. Chapman's authority in this matter arose from authority that preceded the next-day power of attorney.

**{33}** In *Poole*, the Georgia Court of Appeals affirmed the trial court's denial of a motion to compel arbitration. 648 S.E.2d at 431. There, the court explained that the nursing home did not provide any "legal or factual basis for finding an agency relationship in [the] case." *Id.* at 433. The nursing home "broadly assert[ed] on appeal[,] without any supporting citations to the record[,] that 'the facts establish that [the resident's husband] acted as the agent for his wife." *Id.* at 432 (internal quotation marks omitted). In this case, Defendants present ample evidence in the record to indicate that Ms. Barron personally designated Ms. Chapman as her agent for the purpose of completing the admission paperwork.

**{34}** In *Crowdus*, the Kentucky Court of Appeals affirmed the trial court's denial of a motion to compel arbitration where a nursing home employee asked a resident's friend to sign the admission paperwork for the resident who was twice admitted to the nursing home. 281 S.W.3d at 811-12. The nursing home argued that an apparent authority relationship existed at the first admission because the resident's friend had signed the resident into a hospital before the resident was admitted to the nursing home. *Id.* at 814. However, there was no evidence that anyone at the home knew anything about the hospital admission and, moreover, the resident's friend did not recall whether she had in fact signed the resident into the hospital. *Id.* As to the second admission, the nursing home admissions director could not remember anything about the resident's admission, and there was no evidence that the resident did anything to hold the friend out as having authority to act on her behalf. *Id.* Here, unlike *Crowdus*, there is evidence in the record of an actual and apparent agency relationship that arose from Ms. Barron's manifestations to Ms. Chapman and Ms. Santillan that Ms. Chapman was authorized to complete the admission paperwork. Further, unlike *Crowdus*, Ms. Santillan did not approach Ms. Chapman about the paperwork without Ms. Barron's express permission.

**{35}** Plaintiff cites only two cases that arguably support her position. One is an unpublished case from the Kentucky Court of Appeals, which we decline to consider. *See* Rule 12-405(C) NMRA (stating that a "memorandum opinion [of a New Mexico appellate court], because it is unreported and not uniformly available to all parties, shall not be published nor shall it be cited as precedent in any court"); Ky. Rev. Stat. Ann. § 76.28(4)(c) (West 2009) (stating that "[o]pinions that are not to be published shall not be cited or used as binding precedent in any other case in any court of" Kentucky).

**{36}** Plaintiff also cites to *Koricic v. Beverly Enterprises-Nebraska, Inc.*, 773 N.W.2d 145, 148 (Neb. 2009), in which a resident's son signed his mother's nursing home admission documents, including an arbitration agreement. The two had a ten-year history of the son signing medical documents for his mother, but he only signed documents after he explained and translated them for his mother, who had a limited understanding of English. *Id.* at 148, 150. The son testified at a deposition that he never signed on his mother's behalf without her express permission to do so. *Id.* at 150. He further stated that, on their way to the nursing home, his mother authorized him to sign paperwork required for her admission to the home. *Id.* at 151. The court held that, as his mother's agent, the son had been authorized

12

to sign the required admission papers, but that nothing in the record indicated that his mother knew of the arbitration agreement or that the authority she granted to her son included waiving her "right of access to the courts and to trial by jury." *Id.* The court agreed that the resident's son "had authority to sign the mandatory paperwork for admission," but concluded that he "did not have authority to sign the arbitration agreement because it was not a condition of admission." *Id.* at 148.

{37} In rejecting the nursing home's apparent authority argument, the *Koricic* court, among other reasons, explained that the nursing home "knew of [the resident's] limited ability to understand these documents, or she would not have been asking her son . . . to sign them for her." *Id.* at 152. Thus, the resident's limited ability to understand English, which was the reason the resident did not sign the documents herself, was a factor in the court's decision. Here, on the other hand, there is nothing in the record to support the idea, nor do the parties argue, that Ms. Barron was incapable of reading, understanding, or signing the admission documents herself. Moreover, as we have already held, the Resolution of Legal Disputes form was included in the admission paperwork and required a decision either to reject or to accept arbitration as the method of resolving future disputes between the resident and Betty Dare.

{38} In our view, the courts' reasoning in *Carraway*, *Garrison*, and *Hogan* is logically sound and more applicable to the facts of this case. If a mentally competent, alert, and oriented resident gives her agent authority to complete the admission paperwork, that authority is made known to the care facility, and the admission documents include an optional arbitration clause, it follows that the agent has authority to decide whether to reject or accept an arbitration clause in the admission agreement that is to be signed as part of the admission process. If, as Plaintiff argues in this case, Ms. Barron "only . . . authorized [Ms. Chapman] to fill out her 'paperwork' that pertained to Medicare payment 'for her therapies[,]'" then it should follow that Ms. Chapman lacked the authority to complete *any* of the several non-Medicare admission-related documents and provisions identified earlier in this opinion including, as well, any non-Medicare provisions in the Admission Agreement. As Defendants argue, Ms. Chapman would "then [have] lacked the authority to agree to the Admission Agreement, or to admit [Ms. Barron] to the facility." Thus, not only would the arbitration clause be invalidated by Ms. Chapman's lack of authority, the validity of the entire Admission Agreement would be equally vulnerable.

{39} Additionally, we disagree with the district court's comments in the present case that a written power of attorney or an enumerated list authorizing Ms. Chapman to take each specific step was required to indicate the scope of her agency. Rather, Ms. Barron, as the principal, was in a position to limit her agent's authority if she so chose. *Cf. Comstock*, 110 N.M. at 132, 793 P.2d at 262 (stating that "[i]t is always competent for a principal to limit the authority of his agent, and *if* such limitations have been brought to the attention of the party with whom the agent is dealing, the power to bind the principal is defined thereby"); *Morris Oil Co. v. Rainbow Oilfield Trucking, Inc.*, 106 N.M. 237, 240, 741 P.2d 840, 844 (Ct. App. 1987) (recognizing that a principal may limit the authority of its agent and such limitation will be binding on a third party who is aware of the limitation). Furthermore, the law in New Mexico is that an agency relationship may be created orally. *DeBaca, Inc.*, 91

N.M. at 420, 575 P.2d at 604. Therefore, a written power of attorney is not necessary for a principal to create a valid and effective agency relationship. While the better practice for facilities such as Betty Dare might be to require a general power of attorney or more specific authority in admitting a resident, we cannot say that such demonstration of authority was required under the circumstances of this case.

{40}    Having determined that Ms. Chapman's authority encompassed the arbitration clause, we further conclude that Ms. Chapman's decision to accept arbitration bound Ms. Barron to arbitrate future disputes with Betty Dare. Unlike the parties in *McMillan*, *DeArmond*, and *Lisanti*, the record indicates that Ms. Chapman voluntarily and knowingly chose arbitration of future disputes. The Resolution of Legal Disputes form clearly stated that agreeing to arbitrate legal disputes indicated a waiver of a right to sue or go to trial in a court of law. To the extent that Plaintiff argues on appeal that Ms. Chapman did not fully understand the implications of the arbitration clause, we find this argument unavailing. Parties to an agreement are presumed to know and understand the terms of the agreement. *See Ballard v. Chavez*, 117 N.M. 1, 3, 868 P.2d 646, 648 (1994) (recognizing that "each party to a contract has a duty to read and familiarize himself with [its] contents . . . [and] generally is presumed to know the terms of the agreement"). Furthermore, Plaintiff did not develop any evidence as to what Ms. Chapman may or may not have fully understood.

{41}    We are not insensitive to the concerns of nursing home residents and their families. We understand and appreciate that admission agreements and other admission-related documents can be lengthy and detailed and are often presented to aging individuals and their families when they are at their most vulnerable, in need of quick assistance, and potentially can easily be taken advantage of. That said, however, we do not view arbitration clauses such as the one at issue here as inherently unfair or as leaving one or the other party at a disadvantage simply on the ground that they appear within admission documents that an agent has authority to sign. Plaintiff does not attack specific aspects of the Resolution of Legal Disputes form as ambiguous or unfair. Nor does Plaintiff attack arbitration itself as unfair or inadequate, or attack the arbitration clause here as repugnant to New Mexico's policy favoring arbitration. We note that, under the New Mexico Uniform Arbitration Act, arbitrators may award punitive damages or any other relief authorized by law in a civil action involving the same claim. Section 44-7A-22(a). Moreover, there are advantages to arbitration which, among other benefits, are that it generally costs less than litigation and leads to a quicker resolution. *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 280 (1995).

{42}    We thus conclude that the law of agency and New Mexico's well-established public policy preference in favor of resolving disputes through arbitration, where that is the agreement of the parties, require reversal of the district court's denial of the motion to dismiss and compel arbitration.

**Unconscionability and Consideration**

{43}    As we have determined that the district court's ruling regarding the scope of Ms. Chapman's authority was incorrect, we examine Plaintiff's argument that we should affirm

14

the district court on other grounds argued below. We therefore turn to Plaintiff's arguments regarding the procedural unconscionability of and lack of consideration for the arbitration clause.

**{44}** Without making an official finding, the district court commented that it "[did not] think [the arbitration clause agreement was] unconscionable. And . . . if we [had] reached that, [it] would have gone in . . . Defendants' favor." We agree with the district court. Procedural unconscionability, which Plaintiff argues here, has been explained by our Supreme Court as going "beyond the mere facial analysis of the contract and examin[ing] the particular factual circumstances surrounding the formation of the contract, including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other." *Cordova v. World Fin. Corp. of N.M.*, 2009-NMSC-021, ¶ 23, 146 N.M. 256, 208 P.3d 901.

**{45}** In support of her unconscionability argument, Plaintiff cites several cases in which courts from other jurisdictions have identified instances of procedural unconscionability. *See, e.g.*, *Woebse v. Health Care & Ret. Corp. of Am.*, 977 So. 2d 630, 633 (Fla. Dist. Ct. App. 2008) (holding that procedural unconscionability existed where a nursing home resident's daughter met with the home's administrator for about five minutes, during which time she was presented with a thirty-seven page document that included an arbitration clause, and instructed that her father's continued stay in the home was conditioned upon her signing the papers, which the administrator flipped through and presented the signature pages); *Prieto v. Healthcare & Ret. Corp. of Am.*, 919 So. 2d 531, 532-33 (Fla. Dist. Ct. App. 2005) (agreeing with the trial court's finding of procedural unconscionability where a nursing home resident's daughter was "hurried into signing numerous documents" that were not explained to her); *Romano ex rel. Ramano v. Manor Care, Inc.*, 861 So. 2d 59, 63-64 (Fla. Dist. Ct. App. 2003) (reversing an order compelling arbitration based on the "egregious substantive unconscionability of the terms of the agreement" and also concluding that "some quantum of procedural unconscionability" existed, where the nursing home administrator did not explain that agreeing to arbitration was not a condition of admission); *Small v. HCF of Perrysburg, Inc.*, 159 Ohio App. 3d 66, 2004-Ohio-5757, 823 N.E.2d 19, at ¶¶ 6, 9, 25-28 (determining there was procedural unconscionability where a nursing home resident's wife signed an arbitration clause in a matter of minutes, without having the clause explained, and under the stress of her semi-conscious husband being admitted to the facility and immediately transported to a hospital); *Howell v. NHC Healthcare-Fort Sanders, Inc.*, 109 S.W.3d 731, 732, 735 (Tenn. Ct. App. 2003) (holding that an agreement to arbitrate was not binding where the nursing home employee who presented admission paperwork to a resident's illiterate husband "took it upon herself to explain the contract, rather than asking him to read it, and . . . did not mention, much less explain, that he was waiving a right to a jury trial").

**{46}** The procedural unconscionability described in *Woebse*, *Prieto*, *Romano*, *Small*, and *Howell* was not present in this case. Ms. Chapman and Ms. Santillan met for an hour and a half, during which time Ms. Santillan reviewed every section of the Admission Agreement. Ms. Santillan specifically instructed Ms. Chapman to read the Resolution of Legal Disputes form and explained that if Ms. Chapman decided to reject arbitration, she would need to

15

mark the appropriate box on the form and initial next to that mark. Moreover, the Resolution of Legal Disputes form noted in bold at the top of the form that a resident's agreement to arbitrate was not a condition of admission. The form also clearly stated that "agreeing to arbitrate . . . means that [the resident] is waiving [the] right to sue in a court of law and to a trial by jury" and there is evidence in the record that Ms. Chapman read the agreement. Ms. Chapman was free to accept or reject arbitration. There is no evidence that Ms. Chapman was rushed in signing any of the documents, that she felt under any duress, or that she had unanswered questions. Additionally, Ms. Santillan advised Ms. Chapman to read through the paperwork at home and to call if she had any questions. Ms. Chapman stated that she took the documents home and read them over. After reading over the documents at home, which review presumably included the Resolution of Legal Disputes form, Ms. Chapman did not call Ms. Santillan or contact the NAF with questions. We do not believe there was any procedural unconscionability here.

{47} As to Plaintiff's argument that the arbitration clause lacked consideration, we hold that the arbitration clause was a part of the underlying contract, and no additional consideration was necessary for enforcement of the clause. The arbitration clause was one portion of the Admission Agreement and was supported by the same consideration.

**NAF**

{48} The Resolution of Legal Disputes form stated, "[a]ny arbitration conducted pursuant to this [form] shall be conducted . . . in accordance with the [NAF] Code of Procedure for Arbitration." After the district court issued its order in this matter, the NAF entered into a settlement agreement, according to which, it was prohibited from conducting arbitrations. *Ranzy v. Tijerina*, 393 F. App'x 174, 175 & n.1 (5th Cir. 2010) (per curiam) (unpublished). Plaintiff argues that the arbitration clause has been rendered unenforceable due to the unavailability of the NAF. The district court did not have an opportunity to consider or rule on this issue, and it is not properly before this Court. We note that the unavailability of the NAF does not necessarily render an agreement to arbitrate unenforceable simply on the basis of its incorporation in the arbitration document as the forum for the arbitration. "A split in authority exists over whether the unavailability of the NAF as a forum for consumer disputes renders arbitration agreements contemplating NAF as a forum unenforceable, or whether the Federal Arbitration Act in such cases requires the [c]ourt to appoint an arbitrator." *Jones v. GGNSC Pierre LLC*, 684 F. Supp. 2d 1161, 1163 (D.S.D. 2010); *see Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1222 (11th Cir. 2000) (holding that "[t]he unavailability of the NAF does not destroy the arbitration clause"). *But cf. Carr v. Gateway, Inc.*, 918 N.E.2d 598, 603 (Ill. App. Ct. 2009) (concluding that the selection of the NAF as the dispute resolution forum was an integral part of the arbitration clause and affirming the trial court's denial of the appellant's motion to compel arbitration based on the unavailability of the NAF). We therefore respectfully request that the district court consider this issue on remand.

**CONCLUSION**

{49} We reverse the district court's denial of Defendants' motion to dismiss and compel arbitration. We hold that Ms. Chapman had actual authority, which was not limited by Ms.

Barron, and also had apparent authority to complete the admission paperwork; that the arbitration clause did not need separate consideration from the overall Admission Agreement; and that the circumstances surrounding the formation of the agreement do not render the agreement void for procedural unconscionability. On remand to the district court for entry of the appropriate order with respect to arbitration, the court should address the issue of whether the arbitration clause in the Resolution of Legal Disputes form has been rendered unenforceable due to the unavailability of the NAF.

{50}    **IT IS SO ORDERED.**

 

 

_____

**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

 

_____

**CYNTHIA A. FRY, Judge**

 

_____

**MICHAEL E. VIGIL, Judge**

**Topic Index for _Barron v. Evangelical Lutheran Good Samaritan Society_, Docket No. 29,707**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-RM | Remand |
| AE-SR | Standard of Review |
| | |
| **CP** | **CIVIL PROCEDURE** |
| CP-AT | Arbitration |
| CP-MD | Motion to Dismiss |
| | |
| **CM** | **COMMERCIAL LAW** |
| CM-AA | Agency, Agent |
| CM-UA | Uniform Arbitration Act |
| | |
| **CN** | **CONTRACT** |
| CN-CS | Consideration |
| CN-UC | Unconscionable |
| | |
| **RE** | **REMEDIES** |
| RE-AN | Arbitration |